I'm informed by our clerk that counsel are all present and accounted for so we will begin and hear argument in LLM Bar Exam versus Barbri. Good morning, Mr. Spray. Good morning, Your Honors. Judd Spray from the Law Office of Judd R. Spray on behalf of the Appellant, LLM Bar Exam, LLC. Your Honors, in preparation for the argument this morning, I went to Barbri's website last night, that's barbri.com, and one of the claims that's repeated throughout the Barbri website, in these exact words is, and I'm, Your Honor, this is not in the record. I am raising it for two reasons, Your Honor. First, because in Barbri's brief, they cited to two websites of Barbri's competitors and alleged that those websites were, that it was permissible to cite those websites because those companies were addressed in the record. But the other reason is to point out the context in which this case arises. Barbri's website states, ask any judge, attorney, or law professor which bar review they took, and they'll tell you, Barbri, that means something. That's exact language from barbri.com. And it's an astonishing claim for a bar preparation course to make that every judge and every attorney took Barbri to prepare for the bar examination. I didn't take Barbri. And I, it's clearly not. Nor did I. I don't know about Judge Droney, but. I don't remember. What does that mean, though? I mean, isn't that just kind of puffing like advertising? Is that a conspiracy of some kind? That itself is not a conspiracy, no. But, and it's clearly not literally true. But I suspect if we took a poll of everyone in the courtroom, most of the lawyers here did in fact take Barbri, and in fact are aware of Barbri's dominant position in the test preparation market and also its presence on law school campuses. And even though it's not literally true, it's fairly astonishing that Barbri makes that claim at the same time that it claims that it is implausible that the plaintiff's claim is implausible that Barbri has such a dominant market position that it's able to use that position to prevent competition in the market for bar exam preparation courses. And today, for that reason, I want to focus on the three allegations in the plaintiff's amended complaint that relate to. Can I ask you a threshold question that was raised by the opposition here, which is, does your brief comply with Federal Appellate Procedure 28? I mean, it's kind of thin, if nonexistent, as to citations to the record. It certainly is, Your Honor. Is it thin or it complies? No, it is thin, but I believe it complies in that it raises four specific reasons that the district court's opinion should be reversed. But it's supposed to cite to at least the complaint or other parts of the record to help us figure out if you're right about that, and it doesn't do that. And we've dismissed cases before on that basis. Why shouldn't we dismiss this one on that basis? And there's no reply brief either, right? Yes, that's true, Your Honor. And I think there is no question that the brief in support of the plaintiff's appeal is not a model for an appellate brief. It is not ideal. But there are various reasons for that, including that the appellant here is a corporation that's out of business. And its allegation is that it was put out of business by the conspiracy among Barbary and various law schools to prevent it from competing in the market for preparing foreign LLM students to take the bar. So this is a corporation that has limited resources. It spent many of those resources in the district court. And by the time it got to this court, it's just not a well-funded organization. It's essentially not an existing organization. Did you have any involvement in the brief? Me personally, Your Honor? I did not. And to be perfectly honest, I believe I was retained in this matter to hopefully help improve on the arguments that were made in the brief after they were submitted by plaintiff's previous counsel. You know it's a little tough to get here and make arguments—well, it's impossible to get here and make arguments that we're going to listen to if they weren't made in the brief, right? Yes, Your Honor. But the fundamental arguments were made in the brief. And above all— You're a lawyer. You're a counsel, a member of the bar. You've got an obligation to put in a good brief regardless of what you're getting paid for. That's what lawyers are supposed to do. I'm not supposed to do a halfway adequate job because I'm just getting a halfway adequate fee. We get good briefs from people who are impecunious all the time. I understand that, Your Honor, but I believe there's also generally a certain amount of leniency shown toward pro se appellants. This appellant was not pro se. The brief was submitted by— That's why Judge Hull was asking you these questions. Yes, Your Honor. I understand. And I can only answer that. I did not participate in drafting the brief or submitting the brief. But I do believe that the core complaint about the district court's opinion is in fact set forth in the appellant's brief. And I'll look for that if you'll—look for the exact language that I think is sufficient to raise arguments on appeal. You're claiming they attempted to monopolize. Is that right? Yes, Your Honor. What are the—let me hear what you think is support for that contention. Well, the support is stated throughout the amended complaint. Well, give me the highlights. Yes, Your Honor. With regard to each of the five New York law schools who are defendants here, we're no longer concerned with the non-New York law firms because they are no longer part of the case. But with respect to the five New York law firms that are still in the case— Law schools, you mean. I'm sorry. Law schools. There is an allegation as to each law school that first the—that there was an allegation that Barbary conspired with those law schools and entered into an agreement with each of the five law schools to remove—to prohibit the appellant, LBE, from being able to table on campus. Essentially from being able to market its— What did, for example, NYU do in that regard? NYU specifically, those allegations are at pages 25 to, I think, 29 of the supplemental appendix. And first, the allegation is that a particular eastern region vice president for Barbary has relations with the faculty and administration at NYU and that she advised NYU foreign LLM students to complain about LBE to their law school administration so that the law school administration would prohibit LBE, the appellant, from continuing to market its product on campus. Weren't there complaints about your client that your client, for example, didn't refund money when refunds were due? That sort of thing? I think the short answer to that is I don't know whether there were complaints or not. I also think that the district court doesn't know whether there were complaints or not. And yet the district court determined—and this is ultimately, fundamentally the problem with the district court's opinion. The district court made that factual finding. The district court held that there were various reasons for LBE to have been kicked off of these various law school campuses that had nothing to do with Barbary or with stifling competition. And failure to give refunds was one of them, correct? That was one of the things the district court found, yes. But there's no evidence of that. We're not at the evidentiary stage. First of all, we're at what's alleged in the complaint. And as I read the district court's decision, she based her rationale on allegations that were in the complaint that were in conflict with what you're trying to argue. I don't think that's a fair characterization of the complaint, Your Honor. I think that is what the district court said it did. But the district court actually looked at the attachments to the amended complaint. Which it is fully entitled to do. But then drew conclusions about— Possibility. Well, drew conclusions about the truth of the situation. And to the extent the district court's conclusions conflicted with the allegations in—the factual allegations in the amended complaint that must be taken as true on a motion to dismiss, the district court favored its own interpretation of the attachments to the complaint over the allegations of the complaint. What are the plausible allegations of a conspiracy for Section 1 of the Sherman Act in the complaint? What makes it plausible that there was a conspiracy at work here? Is it just the financial incentives that some of the people at the law schools had, or is there anything more than that? That is the primary—the financial incentives of various persons at the law schools are, yes, the basis for the conspiracy to favor BARBRI over its competitors in a way that precluded—that unreasonably restrained trade and ultimately precluded LBE from being able to sell its product at all on these law school campuses. As to each of the five New York law schools who are still a part of the case, the plaintiff alleges that BARBRI makes substantial donations and gifts to the law school. Using Columbia Law School as an example, this is at page 19 of the supplemental appendix. There's an allegation that BARBRI has three faculty members who are also professors at Columbia. Those professors make a substantial amount of money teaching for BARBRI. In some cases, I believe they maybe make more teaching for BARBRI than they do teaching for Columbia. But the allegation, in any event, is that that personal financial incentive gives those law professors an incentive and a reason to cause the law school to favor BARBRI to the unreasonable exclusion of BARBRI's competitors. The claim is that there was a—that we're talking about was that there was a conspiracy to restrain trade. How does that evidence a conspiracy? Sorry, Your Honor, that is only the first component of the conspiracy. That is the—that is in reference to the plus factors that are required to prove a conspiracy with indirect evidence. That is—that is the plus factor concerning a common— But what's the plausible—and we are talking about plausible—allegation, if you're now up to plus factors, that there's a conspiracy in the first instance? Yes, the allegation— The fact that a faculty member gets paid money to teach a BARBRI course doesn't do anything for me. I was on the Twombly case, by the way, so the Supreme Court sort of instructed us how we had to look at these things. We got it wrong here. We're mindful of what Twombly is telling us, Twombly being an antitrust case, as you know. And my understanding of Twombly, of the Supreme Court's ruling in Twombly, is that the plaintiff's burden on—at the pleading stage, on the motion to dismiss, is to move the—is to—is to nudge, I think in the Supreme Court's words, the conspiracy from being merely conceivable to being plausible. So do the— I will try, Your Honor. At Columbia specifically, BARBRI makes large donations to Columbia itself. BARBRI employs law professors from Columbia to teach for BARBRI. And BARBRI also—Columbia also exchanges information with the other law schools who are members of the conspiracy about the market for BAR preparation courses. What does that mean? So I wanted to follow up and ask you, what's the evidence of coordination among the law schools, not just at Columbia but with NYU and the other New York law schools? What's—what are the allegations that are plausible that there was a conspiracy among the New York law schools as well? The allegation is that Columbia—and again, I'm reading from page 19 of the supplemental appendix. The allegation is that Columbia and its representatives, I'm paraphrasing, have exchanged information about LBE's BAR review program business and access to various other law schools, among others, with the other defendants. What's wrong with that? Nothing's wrong with that unless they're restraining trade, Your Honor, unless they're unreasonably restraining trade. And in this case— I'm the—one of the assistant deans at Fordham. I call up my counterpart at NYU, you know, what are you all doing BAR review-wise? What's the feedback you're getting? What do the students seem to like? Any coordination, any correlation between what BAR review they're taking and passage rates and stuff like that? What's wrong with any of that? I can't speak to those hypotheticals, Your Honor. I don't know if those happened or not. What the allegation is— What are they wrong—what would be wrong with that if that were occurring? If the law schools were merely sharing communications about LBE, about the appellant, there would be nothing wrong with that. But the allegation is in this case they conspired together with BARBRI. They ultimately removed LBE from the campuses so it could no longer market its product to law students on campus. And— When did Columbia— Columbia—I'd like to use Columbia as an example. When did Columbia do that? When did it do that? In the fall of 2010. When did Fordham do that? I think Fordham was sometime in 2016. And the district court found for that reason that because the acts were not simultaneous, because they took place over a number of years, that they were not parallel. But I don't think that's a fair reading of the case law in the Sherman Act. I don't think they need to be perfectly simultaneous to reflect parallel conduct across the law schools in the way that they treated LBE, in the way that they ultimately removed LBE from their campuses once LBE started to have a foothold there on that particular campus and started to threaten BARBRI's monopoly and dominant market position. But doesn't Twombly tell us, at least as I understand what the Supreme Court was saying, that mere allegations of parallel conduct do not make it? Yes, Your Honor, but in this case it's parallel conducts with plus factors. Not parallel. It's not simultaneous, Your Honor, but I think they all did the same thing over the course of a few years, which was when LBE began to have some success marketing its product to law students on the campus, that law school then allegedly, at BARBRI's behest, prohibited LBE from further marketing to its students. All right. We'll let you sit down now. You've reserved three minutes for rebuttal, Mr. Sprague. And we're going to hear from the other side, and then you can stand up and rebut them. Good morning, Your Honors. May it please the Court. I don't know if I've got that. The podium, I think, comes up a little bit. Oh, I see. It says up. Oh, goodness. It doesn't give you much. But that's all right. May it please the Court. My name is Peter Julian from Skadden Arts, and I represent the five New York law schools in this appeal. At the council table with me is Brian Burgess from Goodwin Procter, and he represents BARBRI. We propose to split our time equally this morning, and I will address the Sherman Act conspiracy claim and the RICO claim, which was alleged against all of the defendants. And Mr. Burgess will address the monopolization and attempted monopolization claim, because those claims were just alleged against BARBRI. So starting with the Yonitrus conspiracy claim, the district court properly dismissed that claim for two reasons. Number one, the district court properly concluded that LBE had not pleaded any facts that even if true would support a conspiracy. And number two, the district court found that LBE hadn't pleaded any facts that would show a restraint of trade. That is a harm to competition or to the competitive process, as opposed to simply law schools favoring one competitor, BARBRI, over another competitor, LBE, in deciding who it would allow to market on its campus, the bar review programs. In its brief on this appeal, LBE concedes, as it did below, that it's pleaded no direct evidence of a conspiracy. There are no factual allegations in this complaint, really, that the schools talked to each other about LBE generally, or specifically about whether or not to deny LBE tabling privileges at any of the schools. And there's no allegation in this complaint that BARBRI somehow orchestrated a conspiracy among the schools. There's no allegation that BARBRI talked to the schools about what other schools were doing with respect to LBE and marketing on campus. There simply is no direct evidence here of a conspiracy. So LBE asked the court below, and asks this court, to infer a conspiracy from indirect evidence. But there is no real even indirect evidence of a conspiracy. You talked a bit about the parallel conduct. LBE hasn't plausibly pleaded parallel conduct, because it's pleaded that it was terminated or denied access to the law school campuses over a period of six years. And that isn't parallel. In that regard, a case that's not in our briefs, because it was decided since the briefs were filed, but was decided last December in the Eighth Circuit, it's a case called Park-Ermat Drug Corp versus Express Scripts Holding Company. It's found at 911 F3rd 505. It was decided last December. It's instructive. There the court held that the plaintiff had not plausibly pleaded parallel conduct when it alleged that termination by two competing pharmacy networks occurred six months apart. And the court said six months apart, according to the language of the Eighth Circuit, the two allegations lacked temporal proximity. Here, instead of six months, we're talking about six years. A six-year time span between when Columbia first denied, or allegedly first denied, access to its campus in 2010, but LBE was still tabling it for them into 2016. The complaint doesn't allege when LBE lost its tabling privileges, if at all, at NYU and Cardozo, but the earliest allegations of its interaction with these two schools are in 2011 for Cardozo and 2012 for NYU, when these schools allegedly declined to invite LBE to table on their campuses. And LBE doesn't even allege that it ever had any tabling privileges at St. John's, but just that it reached out to St. John's in 2014 and in 2015 to inquire about getting tabling privileges, and St. John's didn't respond. So LBE's alleged experience with each of the different law schools is not sufficiently proximate in time to constitute parallel conduct among the law schools. And that's enough to dismiss LBE's antitrust conspiracy claim, because parallel conduct is the foundational building block on which to plead an antitrust conspiracy when you're trying to plead it in an inferential way, in an indirect way, as opposed to with direct evidence. Without the parallel conduct... They seem to rely on what are called the law school agreements in their second law claim. Is there anything in those law school agreements that would reflect that there was any kind of agreement or coordination of activities by the law schools in New York? Nothing. They didn't put in the law school agreements, and they refer to them in the complaint in sort of a vague way. I don't know if there's an actual written agreement. In fact, I don't think that LBE knows that, because I think they've alleged it's either oral or written. So I don't know if there's something in an agreement that's out there, but basically what the allegation is is that Barb re-agreed with each school to pay the school something or pay the administrator something in order to have tabling privileges at the campus. As we've talked about, I think there's nothing wrong with that. Individually, I presume Barb re-has an agreement with each school, because I don't presume it shows up with a table in the fall without having some arrangement with the school that it's allowed to do that. So it does have an arrangement with each school, perhaps, but there is nothing in the allegations, really, that says that those agreements have anything about communications as between the schools. I don't know if that answers your question, but I don't know any more than that, because I'm looking at the allegations in the complaint, and they don't say. Oh, I want... Parallel conduct or absence of a factor in the RICO analysis? Well, the RICO analysis, I mean, it's a little different, but it's similar, insofar as for the enterprise aspect of it, we have to have some agreement that they agreed to do something together as an enterprise. And so I suppose that it's not... I don't know that in the RICO cases they talk about it that way, but it would be a similar kind of analysis, it would seem to me, that you would have to find some kind of an agreement among the schools to pursue a common goal through a RICO enterprise. And I think the cases say that that RICO enterprise has to have some longevity. There has to be something about the enterprise that's separate and apart from the schools in Barbary. And I don't think any of that is pleaded in the complaint. And the RICO claim has its other fault, which is that it's based on mail and wire fraud as the predicate acts for the RICO claim. And those predicate acts, that mail and wire fraud, is alleged to be intended to defraud LBE. There are no allegations in this complaint that anybody said anything to LBE that was false. I mean, there are really no allegations at all about the statements. It certainly doesn't meet 9B's requirements of particularity when pleading fraud in context of a RICO claim. I wanted to just respond. Judge Parker, you asked about what did NYU do and what was the story with NYU. And it was interesting because one of the... NYU does have a lot of exhibits. And Exhibit 39 to the complaint is an e-mail exchange between Ellen Cosgrove, who's at Harvard, and Emanuele Tosolini, who's the principal of LBE. It's at the supplemental appendix at page 176. It's interesting. She writes to him about why Harvard isn't going to let him table on campus. But she says to him, on a personal note, I was also concerned about the litigious posture you mentioned against the NYU students during our meeting. I mean, this is the kind of thing. I mean, this is the complaint. Refresh my recollection. Well, all I know about it is what's in the complaint. But it is in the complaint that Harvard determined that it wasn't going to let LBE table on campus, in part because it was concerned that LBE had apparently mentioned or boasted that it took a litigious position against NYU students when NYU students wanted to get refunds and there was some conflict about the refunds. But it certainly puts the lie to the plausibility that there was some nefarious conspiracy here. It was basically there were other reasons. It's in the four corners of this complaint. It isn't that these are reasons that clever lawyers dreamed up. Oh, I see my time is up. So I won't continue unless there's any questions. Thank you, Mr. Julian. Thank you, Your Honors. Good morning, Your Honor. Brian Burgess. I'm going to address the claims directed against Barbary. The district court correctly held that LBE could not state a claim under Section 2 against Barbary because, among other flaws, the complaint does not plausibly allege that Barbary has or is dangerously close to acquiring monopoly power in a properly defined antitrust market. The complaint fails on a number of levels. First, the allegations with respect to the product market are plainly inadequate. The complaint effectively just stipulates that there is this independent product market that is comprised of bar review courses that are specifically marketed at LLM students. But this Court's cases make clear that even at the pleading stage, much more is required than that. You have to engage in an analysis of cross-elasticity of demand. You have to determine whether there are reasonably interchangeable products. And the complaint doesn't do any of that. And worse, the allegations that are in the complaint strongly suggest that this is not a plausible product market because LLM students take the same bar exam as any other students. LBE alleges that up until 2009, there was no such thing as an LLM-specific course. They further allege that Barbary didn't come online with a course until 2013. So the suggestion that, you know, even though this is a new product market or a new product offering, it is now so differentiated from general bar review courses that they no longer even compete in the same market such that price increases in one wouldn't discipline the other is just not plausible. The district court was right about the product market. Would that also defeat the Section 1 claim as well, the conspiracy claim? I think that, I mean, you have to ultimately show that there's going to be an effect on competition in the market and the fact that there's no properly defined market and no ability to show competition, I think, yes, would defeat it. In addition to the fact that, as my colleague indicated, that there's no conspiracy, and so that's an independent basis for it, but I agree that that would undermine that claim to the extent they haven't made a showing of an effect on competition. Their inability to define a proper product market would also undercut them on that issue. Even in addition to the flaw with respect to defining the product market, there's, even if you sort of take, you know, arguendo that the market for, that courses directed specifically at LLM students could be its own market, there's still insufficient allegations to show market power. All the complaint indicates on this point is there's an assumption. It assumes that Barbary has a market share of 80 percent, which it actually conflates between that and the bar review market. And my friend, in talking about the Barbary website this morning, in addition to being outside the record, it's notable that he spoke about general bar review courses, not anything specific to the LLM market, which is ostensibly the product market that they're focused on here. But all there are is sort of is a blank assertion of an assumed market share. And other allegations in the complaint undercut the plausibility of market power. First, you have in the exhibits of the complaint, there's clear identifications of competitors that are never addressed in the allegations, including major bar review providers like Kaplan that are repeatedly referenced in the complaint in parallel to Barbary as being among the major bar review providers in this area. One of the declarations that was put in by a student that was sort of advocating for LBE actually was complaining about LBE being unfairly treated vis-a-vis Kaplan, not vis-a-vis Barbary. But there's no effort in the complaint to engage with that. Other facts also sort of undercut the notion of market power, including in particular that LBE repeatedly alleges that Barbary engaged in substantial discounts, was offering major discounts in an effort to attract away its students. But as the district court correctly recognized, that's not the behavior you generally would see if someone actually had market power. It's how you would actually go about competing if you don't have it. In addition, sort of just finishing out the point on market power, even if you could properly allege an adequate market share, you look to other factors, such as, as I mentioned with the discounts, you would also look to whether there are real barriers for entry. There are conclusory allegations by LBE that there were barriers to entry here. But once again, their actual allegations, factual allegations undercut that, given that this is what they say is a market that was developed in 2009, and yet we know that there are multiple competitors that have entered into it, including Barbary, including Kaplan. And their major sort of theory on that seems to be that, well, it takes a while to build up the relationships and the course materials and so on to establish a real presence in the Barbary market. But even if you accept that as relevant to establishing a brand-new bar review course, it in no way has any sort of bearing on whether established bar review providers could cross over and adopt this particular LLM course. So for all those reasons, we think the district court was correct to hold that LBE had not adequately alleged market power to establish a Section 2 claim. In addition, I'll just briefly mention, we've noted in our brief that even apart from that, the complaint does not adequately allege that there was any engagement in monopoly conduct, which is, of course, a separate thing that they have to do to bring a viable claim. There are two basic, and I think sort of the overriding problem with their allegations on that score is there's just no effort to demonstrate harm to competition as opposed to harm to a particular competitor, LBE. There are two theories seem to be. One is about product disparagement that Barbary was saying, things that they claim were defamatory about LBE. As to that, it's under this Court's precedent, and other courts have recognized it's very, very difficult to bring a monopolization claim that's sort of based on false advertising because it presumptively doesn't have any effect on the overall market as opposed to just on one competitor. This Court has, in the Heer's decision, has outlined sort of the test that has to be passed and a number of factors that must be met. But among them is you must, you know, clearly allege at the pleading stage or put forward evidence later on that the statements were clearly false and clearly material. As the district court quite rightly recognized, there was no indication about what the statements were. In the vast majority of instances, they're just general assertions about defamatory comments. And to the extent it's possible to glean what they were referencing, it seems to be just complaints that Barbary was saying that LBE was not established, was not doing as good a job in providing and preparing students for the bar exam, which is, you know, a sort of opinion statement that couldn't possibly give rise to a Section 2 claim. Their other theory, I think, is quite literally that we competed with them, that they were the ones that started this idea with having an LLM-specific course, and we decided to offer our own course and compete with them and take away sales from them. They have this sort of allegation that we stole the course from them. I think it's implausible on its own terms. The things they say we stole are sort of basic features you would have for any bar review course. And in addition, they note that they were sort of publicly advertising the features of their course. But even apart from that, a business tort, a claim that you were sort of stealing a competitor's secrets is not something that generally gives rise to a Section 2 claim because, again, the issue is about showing harm to competition, to the market as a whole, foreclosing competition in the market, not just injuring a single competitor. If the Court has no further questions, we urge you to affirm the district court. Thank you, Mr. Bridges. Mr. Sprague, you've reserved three minutes for rebuttal. Excuse me. Thank you. I just want to make a few points in rebuttal. The first is counsel for the New York Law School has pointed to an e-mail that's attached to the First Amendment complaint. And he made the exact same mistake that the district court made, which is to read that e-mail, to determine what the truth of the situation was as between the author of that e-mail and LBE, and then to decide that having decided what the truth of the situation is, the allegations must be false. That's not the way things are supposed to work on a motion to dismiss under Rule 12b-6. The allegations need to be taken as true, and all inferences need to be given, all reasonable inferences need to be made in favor of the plaintiff. If the plaintiff puts in a document that in substance negates the allegations, what do we do? Well, I think that hypothetical is not what happened here. The e-mail doesn't negate. The allegations of the complaint are that the law schools used the purported complaints of students, which were, I'm sorry, the law schools used the purported complaints as a pretext for removing LBE from the campus. So for a member of one of the law schools to refer to a complaint or to refer to a litigious position or whatever they refer to, is perfectly consistent with the allegation that that was a pretext for removing LBE from the campus. I think... What's the plausible allegation of pretext? Well, your honors earlier asked about Columbia Law School. Specifically with regard to Columbia, the allegations of the complaint are that the first, that in the fall of 2010, LBE held a tabling session where it got the contact information for a number of LLM students. Immediately after that, I think the next day or shortly thereafter, the LBE was banned from Columbia's campus. But because it had the contact information of certain students, some of the students ended up signing up for the LBE course. And the allegation is that 100% of the students from Columbia who took the LBE course successfully passed the bar exam. So Columbia... Well, with regard to Columbia specifically, there really are no student complaints. And there are no even pretextual complaints. And yet... We don't have pretext. Well, there's no reason for LBE to have been banned from Columbia's campus at all, other than at least it's a plausible inference to draw that the LBE was banned from Columbia for the reasons set forth in the complaint. In what ways was your client better, equal to or better than Barbary? It was better... Well, at the time, as of 2009, Barbary offered a one-size-fits-all bar preparation course targeted to American-born native English-speaking JD students who had taken three years of law school, as well as foreign-born LLM students who may have only taken one year of legal training in the United States. The innovation and the good idea behind LBE was to offer a course targeted specifically to foreign-born non-native English-speaking LLM students by giving them specialized instruction, materials that took into account the fact that they may not have taken a full law school curriculum, filling in the gaps where an LLM student wouldn't have a complete background in the subjects that are tested on the bar, and I think on and on. There were a number of innovations that LBE put into its course specifically designed to help foreign LLM students pass the bar. Thank you. Thank you very much. Thank you, all three of you, all of you who are here. We'll reserve decision in this case.